NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0880n.06

No. 10-4386

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Dec 22, 2011*

LEONARD GREEN, Clerk

COREY OFFINEER,

    Plaintiff-Appellee,

v.

DETECTIVE ROGER KELLY,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

BEFORE: ROGERS, McKEAGUE, and DONALD, Circuit Judges.

ROGERS, Circuit Judge. Plaintiff Corey Offineer was tried for sexual assault of his eleven-month-old niece (Baby M), following a complaint by Baby M's parents and an investigation by Defendant Detective Roger Kelly. After the trial court ruled Corey's confessions inadmissible, Corey was acquitted. Corey then sued Kelly for (1) malicious prosecution under the Fourth Amendment, and (2) violating Corey's due process rights by withholding exculpatory material from the prosecutor in violation of *Brady v. Maryland*. The district court denied Kelly's motion for summary judgment on the grounds of qualified immunity, and Kelly immediately appealed. Summary judgment was, however, warranted. First, Kelly cannot be liable for a malicious-prosecution claim because probable cause justified the decision to prosecute Corey, and second, no *Brady* violation occurred because Corey was acquitted at trial.

On May 30, 2006, Christine Robbins and Michael Offineer took their eleven-month-old daughter, Baby M, to the hospital to be examined for possible sexual assault. The parents told Dr.

Michelle Dayton about the baby's red, irritated genitals and recent behavioral changes, which included grabbing her genitals and belly button, hitting herself, crying when her diaper was changed and screaming at night. The parents said that Baby M began exhibiting this behavior two weeks earlier, which coincided with the return of Corey Offineer, Michael Offineer's brother, from California. The parents thought that this was not a coincidence and suspected that Corey had done something to Baby M.

Dr. Dayton performed an examination of Baby M, during which the baby screamed and cried. After discovering a two millimeter laceration at the posterior fourchette, hyperemic perivaginal area, Dr. Dayton called the Muskingum County Sheriff's Office. Dr. Dayton reported that she had observed evidence of injury to the genital area of Baby M, and that the injury was consistent with penetration to the vaginal area. Dr. Dayton also reported the parents' description of the baby's behavioral changes that began when Corey Offineer returned from California.

Muskingum County Sheriff's Deputy Gearhart went to the hospital to investigate. According to Gearhart's report, a hospital nurse said that the examiners had found bruising around the baby's hymen and a tear to the posterior fourchette, injuries which are commonly caused by a sexual assault. According to Corey, the nurse later denied that there was hymenal bruising and the medical reports do not mention such bruising. Rather, the reports only mention finding the two millimeter laceration at the posterior fourchette, hyperemic perivaginal area, as well as a contusion to the posterior left thigh and a five millimeter thin pencil of skin tissue on the hymen that "has no obvious source along

the hymen."[1]  However, Dr. Dayton called the police department and reported that she had found evidence of bruising to Baby M's hymen, which was evidence of trauma consistent with vaginal penetration.  Dr. Dayton also testified that there was bruising to the hymen.  The diagnosis was sexual assault by history.

Gearhart also spoke with Christine Robbins, the baby's mother.  Robbins explained Baby M's behavioral changes and told Gearhart that the only people who had custody of the baby were herself, the baby's father, and All for Kids Daycare.  Robbins explained that she shared custody with Michael Offineer, and that Michael gets the baby one night per week.  Michael had custody of Baby M twice within the last two weeks—Saturday night into Sunday, on May 20 to 21, 2006, and Friday night into Saturday, May 26 to 27, 2006—and had also watched Baby M at Robbins's residence twice during that period.  Robbins also reported that  Michael usually stayed at his parents' house during his visits with Baby M because Michael's apartment smells from being located above a pet grooming business.  In addition to the behavioral changes she had reported to Dr. Dayton, Robbins told Gearhart that she had noticed a bruise on the back of the baby's right leg, towards the outside of the hamstring.

Gearhart also spoke with Michael Offineer.  Michael explained that Corey had returned to Ohio from California, and had exhibited strange, paranoid behavior since his return. Michael explained that on Saturday, May 27, 2006, he had noticed redness in the baby's diaper.  Corey had watched Baby M that evening for about an hour, and when Michael returned the baby was crying in

---

[1]The medical reports are unclear about this skin tissue's origin, *i.e.*, whether it was a strip of Baby M's skin that became transferred onto her hymen during an act of penetration, or if it was something else entirely.  In her grand jury testimony, Dr. Dayton explained that Baby M "had a little area of tissue—tissue that was just poking up like something had been torn off like there had been an injury," DE 109-2 at 2, and that the finger of tissue was "abnormal" and "irregular," *id.* at 3.

her crib. The next morning, the baby woke up crying around 5:30 am. and Michael thought that Corey had been in the baby's room, but he was not sure. Michael stated that Corey did a lot of drugs, was bi-polar, and saw a psychiatrist sometimes.

Deputy Gearhart submitted his report and Detective Kelly was subsequently assigned to investigate the allegations of sexual assault. On June 5, 2006, Kelly interviewed Corey at jail, where he had been incarcerated since a May 29, 2006 arrest for inducing panic.[2] No recording was made of the interview. Corrections officers carried Corey to the interview in a hog-tied position, and Corey resisted. One corrections officer, Sergeant Ric Roush, testified that Corey was "acting very bizarre" and "making various statements in regards to things that I think he was seeing or hearing, people chasing him, to that effect." Kelly read Corey his rights, about which Corey asked no questions. Roush testified that, during the interview, Corey "responded but in a—in a bizarre nature, I guess, just changing course in his answers from one question to the next."

According to Kelly, Corey initially believed the detective was there because "people were chasing him [Corey]." Kelly told Corey that he wanted talk about the baby, to which Corey responded, "I didn't hurt that girl." Corey then became quiet and said, "I did it." When asked to clarify, Offineer said he raped Baby M. Offineer told Kelly that he used "his finger, his penis, [and] a pipe." Offineer initially told Kelly that the rape occurred at a daycare. However, after Kelly explained that the rape could not have happened at the daycare, Corey instead said that he had raped

---

[2] On May 29, 2006, Corey Offineer had been arrested by the Zanesville Police Department. He was found standing in the street in Zanesville with his shirt off, holding a shotgun. He told police officers that he felt threatened because a vehicle containing African–Americans had followed him from Columbus to Zanesville, and he thought someone was coming after him. He was arrested for inducing panic and taken to the Zanesville City Jail.

Baby M in the basement/family room of his parents' house. Corey described the metal pipe with which he had supposedly raped Baby M as six inches long and one half inch in diameter, and said that it was located in the garage of his parents' house. Kelly began to suspect Offineer "was on drugs or had a mental problem," and he terminated the interview.

Kelly later found a pipe in the garage of Corey's parents, but the pipe was twelve inches long and one and a half inches in diameter. Later that evening, Kelly called the jail, and was told that Corey had been placed in a holding cell because he had taken off his clothing and had walked around the area naked.

Kelly returned to jail the next day for a second interview, which the district court described in its opinion:

> Kelly conducted a second interview with Offineer on June 6, 2006, one day after the first interview. That interview was recorded. Kelly began by asking Offineer if he remembered what they had talked about the day before. Offineer stated that they had talked about her niece and what he did to her. When Kelly asked him about that, Offineer stated, "[w]hich was I ... pretty much raped her of her life. I ... I, uh ... raped her. Uh ... I just (loud noise) (inaudible). I was ... the wrong (inaudible) and there's no way goin' back and she's gone now." Kelly asked him when it happened, and Offineer responded, "last night." When Kelly asked what Offineer did last night, he replied, "I killed her." Kelly asked him how he did that while he was in jail, and Offineer stated, "she was upstairs." Kelly then informed Offineer that the baby was not in jail the night before, and Offineer stated, "Well I was at the house and I was downstairs in the living room and I was playin' with her and uh ... I just started (inaudible) on her and uh ... I kept messin' with her and ... (inaudible). Everything and uh ... I (inaudible) killed her." Kelly asked him which house he was talking about, and Offineer told him it was his parents' house and gave the address. Kelly asked Offineer what happened, and the following exchange occurred:
>
> Q: Okay. What was the first thing you did?
>
> A: I was playin' with her, I just ... relaxin' and I laid her down and started messin' with her, you know, uh ... just feelin' her up.

Q: Well whadda you mean by that?

A: Whadda I mean by that is I was rapin' her.

Q: Well what does that mean?

A: It means I was goin' into ... intercourse.

Q: And what were you doin' intercourse with?

A: With [Baby M.]

Q: I know, but what party of the body were you using?

A: Vagina.

Q: And what part of your body?

A: My hand.

Offineer then described how he took the baby's clothes off and began touching her vagina with his fingers, "rubbin' up and down." He stated that he repeatedly put his finger into her vagina, and that he put his index finger "[a]ll the way" in. He said that he then put her penis in her vagina, "in and out. Back and forth." He said it went five or six inches inside of her. He also stated that he ejaculated inside of her. Kelly mentioned that Offineer had talked about using a pipe in their first interview, and Offineer stated that he put a metal pipe "in her anal and vagina." He said he found the pipe in the garage, and he put in back in the garage when he was finished. He said he "put a metal rod ... hot metal rod in her pussy," and that he "burned her womb."

Kelly again asked Offineer when this happened. Offineer initially said, "last night," but Kelly told him he was not watching her the night before because he was in jail. Offineer then said it happened before he went to jail, on Wednesday. Kelly asked if he was sure or if it could have been another day, and Offineer stated that it happened on Monday. He said he was watching the baby for three or four hours. Kelly asked him what happened after he was finished, and he stated that he killed his "family off one by one." Kelly asked him whether he had done what he did to the baby to anyone else outside of his family, and he said he had, to a "rock singer," who was "about forty," and that he did it "up in jail." Kelly asked whether there was anything else he wanted to say. Offineer said there was nothing else, and the interview ended.

6

*Offineer*, F. Supp. 2d at 764-766.

Following the June 6, 2006 interview, Kelly met with Prosecutor Michael Haddox to discuss Baby M's sexual assault. Haddox reviewed Kelly's case file, including Gearhart's narrative report and the reports from Nurse Hivnor and Dr. Dayton. Haddox and Kelly also discussed the June 5 and 6 interviews of Corey. Haddox said that Kelly had explained his concerns that Corey might have a mental problem, and had mentioned Corey's incredible statements about killing Baby M, killing Corey's family, doing something to a rock star, and raping Baby M in improbable fashions. Haddox noted that although Kelly had found a pipe at the Corey's parents' house, both he and Kelly doubted that Corey used such a large pipe to rape Baby M. Haddox also noted that Kelly had found a second, smaller pipe more consistent with Corey's description. Haddox did not recall whether Kelly had told him that, originally, Corey had given the wrong locations and dates for the alleged rape, and had only changed these facts after Kelly alerted him of the inconsistency. Haddox also did not recall if Kelly mentioned that Corey had claimed to have burned Baby M's womb, that Corey had physically resisted being interviewed and had to be brought to his interview by force, or that the jail staff had reported that Corey had exhibited emotional instability even before his two interviews. Haddox believed that Kelly provided him with information about Corey's mental-health diagnoses and treatment. Haddox also testified that Kelly told him about the incident where Corey stripped naked in jail, and that Baby M had been placed in daycare during the same time period in which she began exhibiting the suspicious symptoms.

After speaking with Kelly, either Haddox or Assistant Prosecutor Bob Smith told a secretary to draft a criminal complaint against Corey charging him with rape of a minor. After discussing the

issue, Haddox, Smith, and Kelly decided that the sexual assault occurred on May 20, 2006, based on statements by Michael and Corey. Smith initialed the complaint and Haddox's office contacted Kelly to file the complaint with the court.[3] The next time that Haddox and Kelly spoke about the case was when they met to determine whether the case should be presented to a grand jury.

Haddox also testified about Kelly's role in filing the complaint. Haddox testified that detectives routinely make unscheduled visits to the prosecutor's office to discuss their cases before criminal charges are filed. Every felony complaint needed to be initialed by one of the prosecutors before the detectives could file it with the court. After reviewing hard copies of the documents that Kelly summarized to him during their June 6 meeting, Haddox testified that they fairly captured the information Kelly conveyed to him. Haddox testified that seeing the actual documents would not have changed his decision to file a complaint or seek a grand jury indictment against Corey. Haddox admitted that Kelly technically was not compelled or required to take and file the approved complaint, and that instead Kelly could have chosen to further investigate. However, Haddox testified that no officer had ever refused to take and file one of his approved complaints, and implied that Kelly could have been disciplined had he not filed the complaint. Haddox said that the decision to approve and file the complaint, as well as to seek a grand jury indictment, was his, and that he neither asked for nor received Kelly's advice on these matters.

Kelly's description of the June 6 meeting with Haddox is consistent with Haddox's description. Unlike Haddox, though, Kelly was not deposed. Kelly's investigation summary,

---

[3] Haddox could not remember if Kelly waited at the prosecutor's office while the complaint was being prepared.

however, makes no mention of the inconsistent dates Corey gave for the rape (though it does mention the inconsistent locations Corey gave), nor does it mention Corey's claims of killing Baby M and others.

After filing the complaint, Kelly separately met with the members of Baby M's family. Kelly explained to Michael that "Corey had admitted to doing something to" Baby M. Michael said that he felt the incident had happened on May 20 because he left the baby with Corey for a few hours at this time, and that this would have been the only time that the incident could have happened. Kelly also met with Offineer's parents, who informed him that Corey is bipolar and on medication, but stated that they did not think Corey had been taking his medication because he had not refilled the prescription. The parents told Kelly that Offineer had been acting strangely since he returned from California, and that he had told them that he thought people were after him and his family. They also stated that Offineer had watched the baby on May 20, 2006.

On June 9, 2006, Kelly again met with Christine Robbins, the baby's mother. She repeated that Baby M had undergone behavioral changes beginning the week of May 22, 2006. Robbins noted that Corey had never spoken to her much and had always seemed strange to her. Robbins said that she and Michael disagreed whether Corey should watch Baby M on May 20, 2006.

Grand Jury Proceedings

Dr. Dayton testified during the grand jury proceedings for the rape charge against Corey. Her testimony was consistent with the information related above. Dr. Dayton testified that Baby M had evidence of trauma to her genital region, that there was a tear on Baby M's posterior fourchette, and that there was bruising on Baby M's hymenal ring. Dr. Dayton discussed Baby M's symptoms that

Robbins had described on May 30, 2006. Dr. Dayton testified that the trauma would have been caused by penetration, and that there were no other potential sources of this type of trauma to a child of Baby M's age other than sexual assault.

Kelly also testified during the grand jury proceedings. Kelly did not provide a transcript or recording of either interview with Corey to the grand jury. Kelly told the grand jury that Robbins thought her daughter had been molested by Corey, that Michael believed that Corey was the only person who could have done the act, and that Corey had watched Baby M on May 20, 2006. Kelly did not tell the grand jury that Robbins and Michael initially speculated that Baby M's rape may have occurred on May 27. Kelly testified that he did not know whether Corey had ever been in a mental hospital, whether Corey was on medication, or whether Corey had a history of mental illness. In response to a question about whether Corey had ever been examined by a psychologist or psychiatrist, Kelly said that he thought Corey "has talked to Six County," a mental-health treatment and counseling organization. Kelly also said that he had spoken to Corey's parents about Corey's mental illness.

Describing the June 5 interview with Corey, Kelly told the grand jury that Corey had raped Baby M with his finger, with his penis, and with a six-inch-long/half-inch-diameter pipe. Kelly said that Corey had claimed that the assault happened at a daycare center, and that he later claimed that it happened at his parents' house. Kelly did not mention that Corey had also claimed to have committed the rape in the jail the day before the interview. As for the June 6 interview, Kelly said that Corey "admitted telling me the same thing again, and I went into a little more detail of where it happened." Kelly explained that Corey now said that he assaulted Baby M in his parents'

10

basement/family room, and described where the pipe was located. Kelly said that he had found one pipe that was twelve inches long and one and a half inches in diameter, which was too large to have been used on Baby M, but that he later found a second pipe in Corey's parents' garage that matched Corey's description. Kelly did not tell the grand jury that Corey had also claimed to have burned Baby M's womb.

Kelly was equivocal about whether Corey told him things that were inconsistent with the facts as Kelly knew them. Kelly said that Corey "would say things and for — even in a second interview, he told me this happened and was real consistent in what he was saying about the incident." However, Kelly also informed the grand jury that "during the course of both interviews, [Corey] would act like he wasn't normal," and that Corey "also would throw in there like, you know, like, I also killed my parents. Of course, I knew that wasn't true because I had talked to his parents." Upon being questioned about what other "bizarre" things Corey said, Kelly said, "Well, I understand that, you know, during the course of his statement to me, he said some things that didn't make sense that I proved later that was not—" GRAND JUROR: "How many different things?" KELLY: "—accurate. Some of the things he told me in his interview, I don't know why he told me if—if it didn't happen." Corey's statements clearly concerned the grand jury. "It's—the only problem I have is in the confession, you know, mentally ill or insane person talking gibberish and then that confession doesn't hold much water. You know what I'm saying? And I'd like to hear something from a psychiatrist, you know. Is this guy nuts? He may have done it, but—and tell me he killed his parents." Kelly did not tell the grand jury that Corey had also claimed to have killed Baby M and other members of his family, and that he had supposedly done something to a rock singer.

Robbins and Michael then testified at the grand jury proceedings. Robbins said that she first noticed her daughter's aforementioned symptoms after May 20, and that the baby had never acted that way before. Michael explained that he had let Corey watch Baby M for three or four hours on May 20, 2006, against Robbins's wishes. Corey was alone with Baby M during this time. When Michael returned, Baby M was screaming and would not sleep the entire night. The next day, Michael found blood in Baby M's diaper, and when he tried to clean her up, she began screaming again. The following weekend, Corey was arrested for running around outside Michael's apartment with a loaded shotgun. Michael had Baby M again at his parents' house on the weekend of May 26 to 27, but he could not remember if Corey was there. He said that the only time Corey watched Baby M alone was the weekend of May 20. Michael said that Corey had been diagnosed as bipolar and had stopped taking his medications, and said he believed that Corey was also taking illegal drugs.

Finally, Dan Offineer, Michael and Corey's father, testified. Dan testified that Corey had been acting "extremely tired" and "more on edge than normal" when Corey returned home from California on May 18. Dan said that Corey had stayed at a psych ward when he was eighteen years old, and confirmed that Corey had stopped taking his medication. Dan attacked the allegations against Corey. He pointed out the hospital reports state that Robbins and Michael originally said that Baby M was raped the night of May 26 to 27, and that Baby M was at Dan's house that night but Corey was not. Dan also attacked the adequacy of the medical evidence of rape, mentioned that Corey had said some impossible things in his statements, and explained that, although Robbins claimed that Baby M began exhibiting her symptoms about two weeks before May 30, Corey had still been in California at the beginning of this two-week period. Dan also said that he had informed

12

Corey of Baby M's alleged rape while Corey was in jail, before Corey confessed to the rape. The implication was that this planted a suggestion in Corey's mind that he raped Baby M and spurred a false confession to the crime.

The grand jury issued an indictment on August 10, 2006.

Trial Proceedings

After Corey was indicted by the grand jury, his case went to trial in 2006. That year, the trial court found Corey incompetent to stand trial, and ordered him committed to a behavioral healthcare center for treatment. Approximately one year later, the trial court found that Corey had been restored to competency. Corey's case went to trial, where he was acquitted.

**I.**

Kelly is entitled to qualified immunity on Corey's Fourth Amendment malicious-prosecution claim. Kelly must be accorded qualified immunity if either (1) he did not "make, influence, or participate in" the decision to prosecute Corey, or (2) probable cause otherwise justified the prosecution decision. Kelly argues both of these grounds, as either one requires reversal of the district court's judgment. Even assuming that Kelly "made, influenced, or participated in" the decision to prosecute Corey, the facts of this case show that probable cause otherwise justified the decision to prosecute Corey. Kelly therefore cannot be held liable for Corey's malicious-prosecution claim, and he is entitled to qualified immunity.

**A.**

Evidence sufficient to show that Kelly "made, influenced, or participated in" the prosecution decision is the first required element of Corey's Fourth Amendment malicious-prosecution claim.

13

*Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). The district court implicitly decided that there was evidence sufficient for a reasonable jury to find Kelly influenced or participated in the prosecution decision. Because this conclusion depends on sufficiency-of-the-evidence rulings, *Johnson v. Jones*, 515 U.S. 304 (1995), requires this court to accept that conclusion on this interlocutory appeal, *see Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 537 (6th Cir. 2002). After finding that Kelly omitted the interrogation transcript, as well as details about that interrogation, the court concluded as follows: "Whether the exclusion of that transcript and the details regarding Detective Kelly's leading questions precludes a determination that Kelly gave Haddox a 'full and fair disclosure of all the material facts' is a factual question inappropriate for resolution on summary judgment." *Offineer*, 748 F. Supp. 2d at 768. Given the context of the district court's analysis, this is but another way of saying that there are disputed issues of material fact on whether Kelly influenced or participated in the prosecution decision. *Johnson* therefore requires that we accept that finding on this interlocutory appeal.

**B.**

Regardless of whether Kelly influenced or participated in the decision to prosecute Corey, Kelly is entitled to qualified immunity on Corey's malicious-prosecution claim because probable cause otherwise supported the prosecution decision, *i.e.*, even apart from the evidence of Corey's two interrogations that Kelly presented to Haddox and the grand jury. The district court did not address the issue of probable cause. The undisputed facts, however, show the presence of probable cause,

14

although the issue is close. Because probable cause was present, Corey's malicious-prosecution claim is foreclosed, and Kelly was therefore entitled to qualified immunity on the claim.

"Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Skousen v. Brighton High Sch*, 305 F.3d 520, 528 (6th Cir. 2002). Corey alleges that Kelly misled both Haddox and the grand jury by not disclosing the full context surrounding Corey's two interrogations, including several statements Corey made in the course of those interrogations. "[I]f this court finds that there was probable cause to prosecute [the plaintiff], regardless of any alleged false statements made by [the investigating officer at the preliminary hearing], then [the plaintiff] cannot make out a malicious prosecution claim under the Fourth Amendment." *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001). The probable cause issue depends on whether all the evidence brought to the decision-makers' attention *besides* the evidence Kelly produced pertaining to the interrogations (as this is what Corey considers misleading and improper), provided probable cause to prosecute Corey for the rape of Baby M. Although the matter is close, probable cause supported the decisions made at both stages of the prosecution: (1) Haddox's decision to charge Corey with rape, and (2) the grand jury's decision to indict Corey for rape.

**1.**

Even ignoring the evidence from Corey's interrogations, probable cause supported Haddox's decision to charge Corey with rape. Haddox explained that Kelly had given him the entire investigation file, which consisted of Gearhart's two reports and Baby M's two hospital records.

These four documents contained all material information about Baby M's medical symptoms. These symptoms included bruising in her hymenal region,[4] striking her vaginal area, the aforementioned five millimeter area of skin along the hymen with no obvious hymenal source, a laceration at the posterior fourchette, redness and irritation in her vaginal area, and a contusion to the posterior left thigh. The medical providers opined that these symptoms were consistent with sexual assault. These documents discussed Gibbons's claim that Baby M's symptoms began approximately two weeks before May 30, which coincided with Corey's arrival. The documents mentioned Michael's claims that Corey had watched Baby M alone on May 20 and that Michael had found blood in her diaper the very next day. The documents included Michael's statements that Corey has bi-polar disorder, abuses drugs, and sees a psychiatrist. Finally, the documents mentioned Robbins's and Michael's beliefs that Corey had committed the rape, based on the information above. Haddox further explained that he and Kelly discussed when the rape could have occurred, and that they arrived at May 20 (the date on the criminal complaint) based in part on Michael's statements.[5] Haddox also mentioned that Kelly had told him of Corey being jailed for "inducing panic" by screaming threats in a parking lot while holding a loaded shotgun, because he was supposedly being pursued by African-Americans from Columbus.

---

[4]Corey argues that Baby M did not actually exhibit hymenal bruising, pointing out that the nurse later denied finding any such bruising, and that Kelly's remark about the bruising was therefore untrue. Gearhart's reports, however, referred to such bruising, based on statements from Baby M's medical providers. Whether ultimately true or not, the hymenal bruising information was part of the investigation file, and Kelly properly reported it to Haddox.

[5]Haddox said they also based this on Corey's statements. As Corey made those statements during his interrogations, they must not be considered in this probable cause analysis.

Every one of the aforementioned statements that Haddox reported being told by Kelly was accurate, at least so far as Kelly's investigation had revealed by the time of his meeting with Haddox. This information provides probable cause to believe that Baby M was raped, and it also provides probable cause to believe that Corey committed the rape. Although the information would not present a perfect case against Corey (he was acquitted at trial, after all), it would nonetheless "warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Skousen*, 305 F.3d at 528. Haddox had probable cause to charge Corey with the rape of Baby M.

**2.**

The grand jury also had probable cause to indict Corey for rape, even leaving out the evidence from Corey's interrogations to which Kelly testified. Corey's Fourth Amendment malicious-prosecution claim is also based on Kelly's grand jury testimony, which Corey claims was false and materially misleading. Assuming that Kelly also influenced or participated in the prosecution decision through his grand jury testimony, since we must accept the district court's conclusion that Kelly did so, Corey can only base a malicious-prosecution claim on this testimony if the grand jury did not otherwise have probable cause to indict Corey apart from Kelly's testimony. The evidence presented during the grand jury proceedings established probable cause to indict Corey for the rape of Baby M.

First of all, Dr. Dayton testified that Baby M had evidence of trauma to her genital region, that there was a tear on the posterior fourchette, that there was redness and bruising on the hymenal ring, and that she had a five millimeter finger of skin tissue on the hymen "poking up like something had been torn off like there had been an injury." Dr. Dayton discussed Baby M's symptoms: that the baby was waking up screaming at night, that she was smacking her belly, and that she was grabbing

17

her crotch. Dr. Dayton testified that Baby M was screaming and crying throughout her exam, which is unusual for diapered children, as they are used to having their bottoms naked. Dr. Dayton testified that Baby M's trauma would have been caused by penetration, and that there were no other potential sources of trauma to a child of the baby's age other than sexual assault. Dr. Dayton's testimony alone was sufficient to establish probable cause that Baby M was raped.

The remainder of the grand jury testimony establishes probable cause to find that Corey committed the rape. Robbins testified that she first noticed Baby M's symptoms after May 20, the night Corey had watched the baby, and that the baby had never exhibited those symptoms before then. Robbins said that she did not suspect Michael as the perpetrator, because Baby M acted normal around Michael, and that she had not seen any difference in Baby M's attitude when she went to daycare (at least not before May 20). Robbins testified that she had not felt comfortable with Corey, and that she had not felt Corey was responsible enough to watch Baby M on his own.

Michael testified that he had let Corey watch Baby M alone for several hours the evening of May 20. Michael said that when he returned, Baby M "was screaming bloody murder," so much so that he could not get her to calm down much or sleep the whole night. Michael found blood in Baby M's diaper the very next day, and when he tried to clean her up, she began screaming. Michael had Baby M again at his parents' house on the weekend of May 26 to May 27, but he could not remember if Corey was there. Michael testified that the only time Corey watched Baby M alone was on May 20, when she began exhibiting her symptoms. Michael said that Corey had bipolar disorder, that he had stopped taking his medication, and that he was also using illegal drugs. Michael told the grand jury that he was sure that Corey had raped Baby M. Corey's father, Dan, also testified that Corey had stayed at a psych ward when he was eighteen years old, that Corey had stopped taking his

18

medication as Michael said, and that Corey had been acting "extremely tired" and "more on edge than normal" since May 18, just two days before he allegedly raped Baby M.

The combined testimony of Dr. Dayton, Robbins, Michael, and Dan should "warrant a man of reasonable caution in the belief that an offense has been or is being committed," *Skousen*, 305 F.3d at 528, and that Corey committed it. The evidence implicating Corey certainly was not airtight, especially when leaving out Kelly's testimony about Corey's interrogations and confessions. Nonetheless, enough evidence was presented to the grand jury that it could reasonably have connected Baby M's rape with Corey, even without hearing of his interrogations. It is true that the coinciding of Baby M's symptoms with Corey's watching her could have been mere coincidence, Corey's apparent mental and drug problems may have had nothing to do with the events of this case, and the grand jury ultimately could have believed that someone else was responsible for the crime. But just because the grand jury could have believed that Corey was innocent, does not mean that probable cause could not support the belief that Corey was guilty.

Probable cause thus supported both the charging and indicting stages of the prosecution decision, even if Kelly had never told Haddox of Corey's interrogation statements and if Kelly had never testified before the grand jury. Although we must assume on this appeal that Kelly "made, influenced, or participated in" the decision to prosecute Corey, Kelly still cannot be held liable for Corey's malicious-prosecution claims because probable cause otherwise supported the prosecution decision.

## II.

Even assuming that *Brady v. Maryland*, 373 U.S. 83 (1963), required Kelly to turn over evidence about Corey's confessions to the prosecutor, Kelly is nonetheless entitled to qualified

immunity on Corey's Fourteenth Amendment claim. Corey was acquitted at trial of the charge

against him. Therefore, Corey could not have been prejudiced and denied a fair trial by the assumed

*Brady* violation, and his due process rights under the Fourteenth Amendment were not violated.

Corey's due process claim appears to be primarily based on his allegation that Kelly failed

to turn over exculpatory materials to Haddox before Haddox decided to press charges against Corey,

and that this failure ran afoul of *Brady*'s holding that "the suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is material either to

guilt or to punishment." *Brady*, 373 U.S. at 87. As the *Brady* issue in this claim is a question of law

and does not depend on an evidentiary-sufficiency finding, the court may review the district court's

conclusions on this immediate appeal by taking, as given, the facts that the district court assumed

with respect to this claim. *Johnson*, 515 U.S. at 319. In other words, the issue is "whether, assuming

the plaintiff's version of the facts to be true, the plaintiffs have shown a violation of their clearly

established constitutional rights." *Farm Labor Organizing Comm.*, 308 F.3d at 531 n.3. We thus

assume, as the district court did, *see Offineer*, 748 F. Supp. 2d at 773-74, that Kelly failed to inform

Haddox of this allegedly exculpatory evidence before Haddox made the charging decision. This

evidence includes the following: (1) Corey's mental status during his interviews with Kelly; (2)

Kelly's use of leading questions during his interviews with Corey; (3) the lack of rape-kit evidence;

(4) the lack of audio recording of the first Kelly-Corey interview; and (5) the lack of DNA testing

on a metal pipe allegedly used in the rape.[6] Per these assumptions, Haddox then filed a criminal

---

[6]Even some of these assumptions may be improper. For example, Corey does not deny that Kelly at least gave Haddox a summary of the interviews with Corey; this summary included Kelly's concerns about Corey's mental status. However, since Corey cannot maintain his *Brady* claim due to his acquittal at trial, we accept the above assumptions for the sake of argument.

complaint, sought an indictment, and ultimately prosecuted Corey on the rape charge, all without knowing of the above evidence (or having an incomplete and misleading view of the evidence). This evidence may have shown Haddox that the case against Corey was much more tenuous than Haddox believed, possibly changing Haddox's decision to bring charges in the first place.

Leaving aside an obvious underlying question—may a *Brady* claim be premised on a police officer's alleged failure to disclose exculpatory material to a prosecutor, rather than on a prosecutor's alleged failure to disclose such evidence to the defense?—Corey's acquittal on his criminal charge means that any supposed *Brady* violation committed by Kelly was not prejudicial, and therefore not actionable. One of the components of any *Brady* claim is that "prejudice must have ensued" from the government's nondisclosure of exculpatory evidence. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281. Corey received a favorable verdict in his criminal case, even in the absence of the exculpatory materials supposedly suppressed by Kelly. Thus, "the government's suppression of evidence" could not have "undermine[d] confidence in the outcome of the trial." *Apanovitch v. Houk*, 466 F.3d 460, 475 (6th Cir. 2006). Cases from this court confirm that due process claims based on the wrongful suppression of exculpatory evidence are unavailable where, as here, the claimant was acquitted of his criminal charges. *See, e.g., Lindsay v. Bogle*, 92 F. App'x 165, 170 (6th Cir. Feb. 3, 2004); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988).

The district court did not address the preclusive effect of Corey's acquittal on his Fourteenth Amendment claim. Instead, the district court simply noted that "a genuine issue of material fact

exists about what information Detective Kelly actually shared with Prosecutor Haddox," *Offineer*, 748 F. Supp. 2d at 774, and denied Kelly's motion for summary judgment on that ground. Corey's acquittal, however, is not disputed, and that acquittal necessarily resolves this claim in Kelly's favor regardless of any other factual disputes between the parties. The district court therefore should have granted Kelly's motion for summary judgment with respect to this claim and accorded Kelly qualified immunity.

Corey protests that his Fourteenth Amendment due process claim is about more than just Kelly's alleged suppression of exculpatory evidence. "The Plaintiff alleges something much broader and more sinister, the intentional manufacturing of false 'evidence' and the concealment of that truth by a police officer, resulting in a lengthy loss of liberty to an innocent man," and that "[t]his was an effort by a detective to 'railroad' a defenseless mentally ill man into a life sentence in prison, using knowingly false evidence." Appellee Br. at 72. Characterizing the due process claim this broadly, though, makes it fundamentally identical to the malicious-prosecution claim. The "two" claims would allege the same thing: that Kelly violated Corey's constitutional rights by knowingly withholding or fabricating critical evidence, causing Corey to be wrongfully tried for a crime he did not commit. Because the State had probable cause to prosecute Corey even apart from Kelly's alleged misinformation, this type of claim must fail. Corey was no doubt harmed by being dragged through a prosecution only to be acquitted, but without an unprecedented expansion of constitutional law, he cannot shape his misfortune into a viable due process claim.

The district court's judgment is reversed, and the case is remanded for the district court to dismiss the claims brought against Kelly.